# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| PAULA L. MAULOLO,<br><br>                  Plaintiff,<br><br>vs.<br><br>BILLINGS CLINIC and SUN LIFE<br>ASSURANCE COMPANY of<br>CANADA,<br><br>                  Defendants. | CV 19-69-BLG-SPW-TJC<br><br><br>**FINDINGS AND<br>RECOMMENDATIONS OF<br>U.S. MAGISTRATE JUDGE** |

Plaintiff Paula L. Maulolo ("Maulolo") brought this action against her former employer, Billings Clinic, and its employee benefit plan underwriter, Sun Life Assurance Company of Canada ("Sun Life"), alleging wrongful denial of benefits under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).  (Doc. 1.)  Billings Clinic has since been voluntarily dismissed as a defendant.  (Doc. 3.)

Before the Court is Maulolo's Motion for Summary Judgment (Doc. 17) and Sun Life's Cross Motion for Summary Judgment (Doc. 20).  The matter is fully briefed (*see* Docs. 18, 21, 24, 26) and for the following reasons, the Court recommends Maulolo's motion be denied and Sun Life's motion be denied in part and granted in part.

# I. Factual Background[1]

Billings Clinic employed Maulolo between January 7, 2008 and January 12, 2018. (Doc. 23 at ¶ 2.) Maulolo held three positions during this time, including Internal Medicine Residency Program Administrator, Organizational Development Consultant, and Medical Education Specialist. (*Id.*; A.R. 20, 160, 265.) Maulolo also owned a jiujitsu dojo with her husband and worked as a certified health coach for Optavia on the side. (Docs. 23 at ¶ 3; 25 at ¶ 18.)

Maulolo first sought medical care for radiating back and leg pain in the spring of 2016, after experiencing pain symptoms for years. (Doc. 23 at ¶ 4.) The pain affected Maulolo's homelife and physical activities; she had lost 140 pounds over the previous seven years from exercise, but now found her capabilities limited. (*Id.* at ¶¶ 5-6.) On December 3, 2016, an MRI revealed a sacral cyst at the L5-S1 vertebra. (*Id.* at ¶ 7.) Maulolo undertook nonoperative measures to alleviate the pain, including injections, electrical stimulation, and bed rest, and ultimately opted to have a lumbar drain placed in the cyst. (*Id.* ¶¶ 8-9.) The drain improved radicular symptoms but caused intense sacral pain. (*Id.* at ¶ 9.) On February 2, 2017, Maulolo had a shunt installed and experienced symptomatic relief for approximately 48 hours. (*Id.* at ¶ 10.) The incision for the shunt,

---

[1] The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment and are taken from the parties' submissions. The facts are undisputed unless otherwise indicated.

however, began building fluid, causing positional headaches, and did not result in lasting relief. (*Id.*) Maulolo continued to work through these procedures and integrated various measures to find comfort, such as a standing desk or laying down for brief periods to help alleviate her pain. (*Id.* at ¶ 12.)

Maulolo had the cyst surgically removed in August 2017 by Dr. Feigenbaum, a neurosurgeon in Dallas, Texas. (*Id*. at ¶ 13.) Dr. Feigenbaum identified the cyst as a sacral meningeal cyst. (*Id.* at ¶ 7, FN1.) Maulolo took medical leave for the month of August, and by the end of the month had made "slow but steady" progress with the use of prescription medication, but still had some continuing sacral and leg pain. (*Id.* at ¶ 14.) Maulolo had a post-op follow-up in Billings, Montana, with Dr. Kari Kale in October 2017. (*Id.* at ¶ 15.) Dr. Kale's notes state that Maulolo was "[s]till in lots of pain, but gradually improving," had increased her steps to 8,000 – 10,000 per day, could not stay in one position too long, and uses a "sit to stand desk at work." (*Id*.) Maulolo followed up again with Dr. Kale on November 15, 2017 and reported to her that her pain was gradually worsening, activities worsened the pain, and work was difficult. (*Id.* at ¶ 16.)

Dr. Kale referred Maulolo to Dr. Michael Schabacker, a pain specialist, who consulted with Maulolo on December 12, 2017. (*Id.* at ¶ 17; Doc. 25 at ¶ 25.) Dr. Schabacker's notes documented Maulolo's reports of "persistent deep aching and

stabbing pain in the lower reaches of her lumbar spine" that "radiates distally into her lower extremities but does not follow a radicular pattern." (Doc. 23 at ¶ 17.) Dr. Schabacker further documented severe and incapacitating pain that was creating "substantial despair in her life," including dependence on family for household duties like cooking. (*Id.*) Dr. Schabacker concluded: "Clearly, the impact of this chronic pain condition on her life both at home and at work is dramatic." (*Id.*) Dr. Schabacker increased Maulolo's pain medications (Oxycontin and Oxycodone) and referred her to Dr. Giancarlo Barolat in Denver, Colorado, for possible spinal cord stimulation therapy. (*Id.* at ¶ 18; Doc. 25 at ¶ 26.)

Billings Clinic had provided workplace accommodations for Maulolo, including a special chair, a standing desk, permission to use a conference room to lay down, and a yoga mat to lay down in her office. (Doc. 23 at ¶¶ 19-20.) In December 2017, Maulolo requested additional accommodations to allow her to work from home. (*Id.* at ¶ 19.) Billings Clinic denied Maulolo's request for accommodation on January 5, 2018, based on the requisites of her job description, such as attending meetings, escorting medical students and residents, and other in-person tasks. (*Id.* at ¶ 20.)

Maulolo was also informed on January 5, 2018 that her 12 weeks of leave was expiring on January 8, 2018; that she may be placed on inactive status for up to 12 weeks; and that she may be eligible for long term disability benefits under

Billings Clinic's group policy with Sun Life. (*Id.* at ¶ 21.) Maulolo applied for long term disability with Sun Life on January 10, 2018 and resigned from her position on January 12, 2018. (*Id.* at ¶¶ 22, 38; Doc. 25 at ¶¶ 1, 17; *see* A.R. 18-20, 25-55.)

After her resignation, Maulolo continued medical treatment with consistent reports of incapacitating pain. (Doc. 23 at ¶¶ 23-30.) Concerned with the quantity of opiates Maulolo was taking to control her pain, Dr. Schabacker discussed with her the possibility of a conventional spinal cord stimulator trial in Colorado with Dr. Barolat. (*Id.* at ¶ 27; A.R. 430, 432.) As part of the trial, it was recommended that a reduction in pain medication occur. (Doc. 23 at ¶ 27; A.R. 436.) Maulolo then underwent spinal cord stimulator treatment on April 20, 2018, which involved the percutaneous placement of a temporary stimulator. (Doc. 23 at ¶ 29.) Maulolo initially reported near-complete pain relief in the short-term and considered a permanent stimulator. (*Id.*) Dr. Barolat opined that Maulolo suffered "from a chronic, severe, permanent neuropathic pain condition with the characteristics of a lumbar postlaminectomy syndrome," and was a "great candidate for a permanent spinal cord stimulation implant." (*Id.* at ¶ 30.) On June 19, 2018, Dr. Barolat implanted a permanent spinal cord stimulator. (*Id.* at ¶ 31.)

Maulolo visited Dr. Schabacker's nurse in a follow-up to the stimulator installation on August 1, 2018. (*Id.* at ¶ 33.) Maulolo reported her frustration with

the amount of relief from the stimulator; while some improvement had occurred, it was not at the level to which she had hoped. (*Id.*) Maulolo felt the pain was well-managed when immobile but worsened with activity and included new pain in her thorax. (*Id.*)

Two-weeks later, on August 14, 2018, Dr. Schabacker noted that Maulolo was "a viable candidate for application disability [*sic*] given the substantial impairment in function chronic pain condition has imparted. … It is apparent she is substantially limited functionally." (*Id.* at ¶ 35.) Dr. Schabacker reiterated his professional opinion in a February 2019 letter that as Maulolo's treating physician she was disabled as of December 29, 2017. (*Id.* at ¶ 36.) The Social Security Administration determined Maulolo was disabled as of January 5, 2018. (*Id.* at ¶ 37.)

Sun Life was unable to make a disability determination based on its initial processing of Maulolo's claim. (*Id.* at ¶ 41.) Sun Life subsequently interviewed Maulolo on January 25, 2018, during which Maulolo disclosed that she had two jobs in addition to her position as a Medical Education Specialist at Billings Clinic: the aforementioned jiujitsu dojo, Big Sky Gracey Jiu Jitsu, LLC, that she co-owns with her husband; and the sales-commission job with health coaching company Optavia. (*Id.* at ¶ 42; Doc. 25 at ¶ 22.) Sun Life further determined "in lieu of an ISO search … a background check given the claim circumstances would be best."

(Doc. 23 at ¶ 43.)  No explanation was given as to what "claim circumstances" prompted the background check.  (*Cf.* A.R. 122 and 1009.)  Sun Life obtained a background check investigation from PHOTOFAX, INC.  (Doc. 23 at ¶ 44; *see* A.R. 264-311.)  The background check revealed details of Maulolo's day-to-day life, from recreational activities to social media posts, and included interviews with neighbors.  (Doc. 23 at ¶¶ 45-46.)  The investigator summarized the neighbors' observations as confirming her injuries, surgeries, and activity level pre- and post-injury.  (*Id.* at ¶ 46.)

Nevertheless, Sun Life rejected Maulolo's claim on March 13, 2018.  (*Id.* at ¶ 48; *see* A.R. 343-348.)  Sun Life's rejection letter stated:

> we have determined that the medical evidence does not support that you would be precluded from performing the Material and Substantial Duties of your Own Occupation as Medical Education Specialist I throughout and beyond the Elimination Period.  As such, you do not meet the definition of Total Disability and benefits are denied.

(Docs. 23 at ¶¶ 48-49, 52; 25 at ¶ 42; A.R. 348.)  "Own Occupation" is not defined in the Group Policy or in the rejection letter.  (*See generally* Doc. 13 at 10-11; A.R. 342-343.)  The Group Policy and rejection letter, however, define "Elimination Period," in relevant part, as:

> the number of consecutive days of Disability, shown in the Benefit Highlights, which must be completed before we will pay you the benefit.  No benefits will be paid to you for any portion of your Disability that occurs during your Elimination Period.

(Docs. 13 at 8; 23 at ¶ 51; 25 at ¶ 8; A.R. 342-343.) Maulolo's Elimination

Period ran from December 29, 2017 through March 29, 2018. (Docs. 23 at ¶

51; 25 at ¶ 10.) Last, the Policy defines "Total Disability" and "Totally

Disabled" as:

> during the Elimination Period and the next 24 months you are unable
> to perform one or more of the material and substantial duties of your
> Regular Occupation.
>
> After 24 months of receiving Total and Partial Disability benefits
> combined, Total Disability and Totally Disabled means you are unable
> to perform with reasonable continuity any Gainful Occupation for
> which you are or could become reasonably qualified for by education,
> training and experience.
>
> Total Disability must be caused by an Accident or Sickness and must
> commence while you are insured under the Policy.

(A.R. 36.)

Maulolo appealed Sun Life's benefit determination on March 22, 2018 and

included medical records from ten additional providers. (Docs. 23 at ¶¶ 53-54; 25

at ¶ 43; A.R. 357.) Sun Life forwarded Maulolo's medical records to Dr.

Germaine N. Rowe for review. (Docs. 23 at ¶ 56; 25 at ¶¶ 44, 46, 47, 50-52.) Dr.

Rowe noted that the clinical evidence supported Maulolo's physical condition as

functionally impaired and concluded that "from the perspective of Pain Medicine,

the medical data supports that the claimant has remained functionally impaired

from 12/29/17 to the present [June 15, 2018]." (Docs. 23 at ¶¶ 56, 64; 25 at ¶ 53;

A.R. 586.) But Dr. Rowe also found that Maulolo had the ability to perform

certain physical activities between 12/29/17 and 4/19/18, such as sitting 6 hours per 8-hour day; walking and standing 60 minutes/hour at a time, 8 hours total per day; and lifting and carrying 50 pounds occasionally and 25 pounds frequently. (Doc. 25 at ¶ 53; A.R. 587.)[2]

Maulolo's appeal was denied on July 3, 2018 on the grounds of insufficiency of evidence to support continuous "Total Disabled" status throughout the Elimination Period. (Docs. 23 at ¶¶ 57-59; 25 at ¶ 57.) Maulolo contacted Sun Life to dispute the decision and to assert that Dr. Barolat had additional records supporting her disability. (Docs. 23 at ¶ 60; 25 at ¶ 59.) Sun Life agreed to consider Dr. Barolat's records and arrange for Sun Life's consulting physician, Dr. Rowe, to speak with him. (Docs. 23 at ¶ 61; 25 at ¶ 61.) Dr. Barolat later confirmed in writing the contents of his discussion with Dr. Rowe, but corrected a mischaracterization, circling the statement: "You stated that the claimant can work a job with prolonged sitting or lifting," and instead hand wrote: "I believe I stated that the claimant needs a FCE [Functional Capacity Evaluation] to evaluate the extent of her work capabilities/limitations." (Docs. 23 at ¶¶ 62- 63; 25 at ¶¶ 65-67;

---

[2] Sun Life also referred Maulolo's medical records for a psychiatric opinion relative to Maulolo's claim of disability due to psychiatric issues. (Doc. 25 at ¶ 54.) But the denial of benefits based on psychiatric conditions is not raised in this action. (Doc. 1 at 9 n.1.)

*see* A.R. 668.)  Maulolo told Sun Life she would try to obtain an FCE from Dr. Schabacker on her next visit.  (Doc. 25 at ¶ 68.)

On September 1, 2018, Dr. Schabacker noted that "[i]t is apparent she is substantially limited functionally."  (A.R. 677.)  Regarding the ordering of an FCE, Dr. Schabacker appears to write it was not necessary, but the note's message is unclear: "I do not believe that FCE is nothing very [*sic*]."  (*Id.*)  It is undisputed that Maulolo did not undergo an FCE.  (Doc. 23 at ¶ 66.)

Dr. Rowe issued an addendum report on October 3, 2018.  (Doc. 25 at ¶ 72.) The addenda included Dr. Barolat's additional reporting, but did not alter Rowe's original conclusion relating to the Elimination Period, which included sitting 6 hours per 8-hour workday; walking and standing 60 minutes/hour at a time and 8 hours total per 8-hour workday; lifting and carrying 50 pounds occasionally and 25 pounds frequently; and bending, squatting climbing, kneeling frequently.  (A.R. 725.)

Sun Life denied Maulolo's appeal on October 9, 2018.  (Docs. 23 at ¶ 65; 25 at ¶ 73.)  Sun Life based its denial "on the opinion of Dr. Rowe," concluding that while Maulolo had experienced two closed periods of disability, she had failed to demonstrate disability during the Elimination Period, and that she was ineligible because her coverage had ended December 28, 2017, the last full day of work, and no longer "actively at work."  (Docs. 23 at ¶ 65; 25 at ¶ 74.)  Sun Life also

concluded that Maulolo's medical limitations "would not prevent you from performing the duties of your Regular Occupation as an Administrative Assistant (classified as requiring a sedentary physical exertion level)." (Doc. 23 at ¶ 65; *see* A.R. 742.) Sun Life also explained that Maulolo had exhausted her administrative remedies regarding the disability decision from a physical condition(s) perspective." (*Id.* at ¶ 67; Doc. 1 at 9.)[3]

Maulolo filed the instant action on June 13, 2019, seeking relief from wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B) and (a)(3). (Doc. 1.)

## II.    Legal Standards

### A.    ERISA Standard of Review

In the context of ERISA, the standard of review may differ depending on the policy language under which a plaintiff brings a challenge. In cases where a plaintiff challenges a denial of benefits under 29 U.S.C. § 1132(a)(1)(B), the standard of review is *de novo* unless the policy or benefit plan contains a discretionary clause. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); see also *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006); *Nolan v. Heald Coll.*, 551 F.3d 1148, 1153 (9th Cir. 2009); and *Gordon v. Metro. Life Ins*. Co., 747 F. App'x 594 (9th Cir. 2019) ("The district court reviews

---

[3] Sun Life allowed Maulolo to pursue an appeal based on any psychiatric condition, but again, that issue is not presented in this action. (Doc. 1 at 9 n. 1.)

a decision to deny benefits under an ERISA plan *de novo* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.") (internal quotation, citation omitted).

Here, the parties appear to agree that the Policy does not contain a discretionary clause and *de novo* is the appropriate standard of review. (Docs. 18 at 7; 21 at 13.)

## B. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party. *Id.* When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when]

he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

Both parties appear to be under the mistaken impression that "the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply" to the instant matter. (Docs. 21 at 8; 24 at 9.) In support, the parties look to this Court's ruling in *Sand-Smith v. Liberty Life Assurance Co. of Bos.*, 2017 WL 4169430 at *2 (D. Mont. 2017) and the Ninth Circuit's opinion in *Nolan v. Heald Coll.*, *supra*. The parties' reliance on these cases is misplaced.

*Sand-Smith* was "an abnormal ERISA case," in which the Court was not asked to determine whether the plaintiff was entitled to long term disability benefits. *Sand-Smith* at *2. The Court instead determined whether Montana's mental health parity law voided the plan's mental illness limitation. *Id. Sand-Smith*, in other words, was not a suit to recover benefits, and did not rely on a determination of whether genuine issues of material fact existed.

In *Nolan*, the usual summary judgment standard did not apply because the underlying plan granted the defendant-insurer discretionary authority to interpret the plan and determine eligibility of benefits. *Nolan*, 551 F.3d at 1153. In that event, the administrator's decision to deny benefits is reviewed for an abuse of discretion. *Id.*; see *Abatie*, 458 F.3d. at 963. Ordinarily, "where the abuse of discretion standard applies in an ERISA benefits case, 'a motion for summary

judgment is merely a conduit to bring the legal question before the district court and the usual tests of summary judgment … do not apply.'" *Nolan*, 551 F.3d at 1154 (citing *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999)).  But where, as here, review is conducted *de novo*, the traditional rules of summary judgment apply.  *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 942 (9th Cir. 1995) ("in considering motions for summary judgment, the district court must decide whether there are genuine issues of material fact, not whether there was substantial or ample evidence to support the plan administrator's decision."); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1087 (9th Cir. 1999) ("[W]e conclude that there was a genuine issue of fact as to whether Kearney was disabled in the sense defined by the policy.")  "Under the *de novo* standard of review, an administrator's decision to deny benefits cannot be decided by summary judgment if genuine issues of material fact are in dispute, because in such a case a trial is necessary."  *O'Neal v. Life Ins. Co. of N. Am.*, 10 F. Supp. 3d 1132, 1136 (D. Mont. 2014) (citing *Tremain v. Bell Industries, Inc.*, 196 F.3d 970, 978 (9th Cir.1999)); *Gordon*, 747 F. App'x at 595 ("Summary judgment in an ERISA case is only proper where there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law.").

Here, Maulolo challenges Sun Life's denial of long-term disability benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), via summary judgment under Fed. R.

Civ. P. 56. (Docs. 1, 17.) Billings Clinic's group plan, as noted above, does not contain a discretionary clause. Thus, the *de novo* standard of review applies, as well as the traditional rules of summary judgment.

Sun Life further asserts, however, that the Court should covert the parties' cross-motions for summary judgment to motions for judgment under F. R. Civ. P. 52. (Doc. 21 at 8.) Under Rule 52, Sun Life argues, the Court "can and should make findings of fact and conclusions of law and enter judgment," without regard to issues of fact. (*Id.* at 8.) In support, Sun Life again cites to *Sand-Smith* and *Nolan*, as well as another District of Montana case, *Fisher v. Cont'l Cas. Co.*, 2012 WL 3100560, at *2 (D. Mont. July 30, 2012), for the proposition that courts within the Ninth Circuit may convert Rule 56 motions to Rule 52 motions to enable the court to weigh the evidence in the administrative record, make credibility determinations, and make findings of fact and conclusions of law. (*Id.* at 9.)

Maulolo opposes such a conversion, arguing that Sun Life has failed to articulate any reason to apply Rule 52 or explain why it prefers resolution under Rule 52 as opposed to Rule 56. (Doc. 24 at 6.)

Sun Life is correct that ERISA cases which are not appropriate for summary judgment may ultimately be determined under Rule 52. The Ninth Circuit has determined that a full trial *de novo* in ERISA cases where there are issues of fact would undermine ERISA policies which favor minimizing the diversion of funds

15

for benefits to litigation expenses and promoting prompt and fair settlement procedures. *Kearney v. Standard Insurance Company*, 175 F.3d 1084, 1094 (9th Cir. 1999). Therefore, a district court is authorized to try the case on the record before the administrator in a "bench trial on the record." *Id.* at 1095. Unlike summary judgment, "[i]n a trial on the record . . . the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true," and make findings of fact under Rule 52. *Id.*

But neither party has moved the Court for judgment under Rule 52. Further, Sun Life has provided no authority for the proposition that the Court can simply convert the parties' summary judgment motions under Rule 56 to motions for judgment under Rule 52. Sun Life's reliance on *Fisher v. Cont'l Cas. Co.* as authority for this procedure is unconvincing. Even though *Fisher* was a *de novo* review case, the court expressly stated that the parties had *agreed* to "resolution of any issues of fact by way of a bench trial on the administrative record" under Rule 52. *Fisher*, 2012 WL 3100560, at *2. Here, no such agreement has been made. Indeed, Maulolo explicitly opposes Sun Life's request and both parties have moved for summary judgment. (Docs. 17; 20; and 24 at 6-10.)

Moreover, new evidence that was not before the ERISA benefits plan administrator may be considered "to enable the full exercise of informed and independent judgment." *Mongeluzo v. Baster Travenol Long Term Disability Ben.*

*Plan*, 46 F.3d 938, 943 (9th Cir. 1995); see also *Thomas v. Oregon Fruit Prod. Co.*, 228 F.3d 991, 996 (9th Cir. 2000) (ERISA benefit claims are subject to a "*specialized* form of bench trial," in which the court has "discretion to consider additional evidence under limited circumstances.") (emphasis original).  The Court is not aware whether the parties desire to submit any such evidence here, or whether it would be appropriate to consider new evidence in this case.  But by converting the parties' Rule 56 motions, and considering this matter under Rule 52, the parties would be denied the opportunity to request consideration of any additional evidence which may be appropriate.

Therefore, the Court recommends that Sun Life's request to the convert the instant motions for summary judgment to motions for judgment under Rule 52 be denied.

## III.   Discussion

Maulolo bears the burden of proof to establish disability under the terms of the plan.  *Muniz*, 623 F.3d at 1294; *Estate of Barton v. ADT Sec. Servs. Pension Plan*, 820 F.3d 1060, 1066 (9th Cir. 2016) ("where an employee must establish an illness to qualify for disability benefits, the burden lies most sensibly with the claimant, who can provide test results, physician reports, and other evidence about her condition.")  The claimant must show they are disabled by a preponderance of the evidence.  *Eisner v. The Prudential Ins. Co. of Am.,* 10 F. Supp. 3d 1104, 1114

(N.D. Cal. 2014). The parties' arguments in support of their respective motions for summary judgment essentially amount to Maulolo arguing she met her burden to establish total disability, and Sun Life arguing she fell short of that burden and therefore rightfully denied her benefits.

Maulolo asserts that the medical evidence on the record demonstrates disability. (Doc. 24 at 10.) Maulolo argues that in denying a disability determination, Sun Life (1) failed to undertake an adequate investigation of her claim; (2) disregarded medical evidence in the record that supported her claim; (3) contradicted the opinions of treating and reviewing doctors regarding her functional capacity; and (4) was improperly motivated to deny benefits by an unfounded suspicion that she was committing insurance fraud. (*Id.*)

Sun Life argues that Maulolo failed to meet her burden of proof to establish total disability and, thus, Maulolo's arguments relating to the adequacy of investigation, disregarding medical evidence, and improper motivations to deny benefits are irrelevant. (Doc. 21 at 13.)

The Court finds genuine issues of material fact exist as to whether Maulolo met her burden of proof establishing disability. For Maulolo to be considered disabled under the group plan, she had to be "unable to perform one or more of the material and substantial duties of [her] Regular Occupation" during the 90-day Elimination Period. (A.R. 36.) The parties agree Maulolo's Elimination Period

18

ran from December 29, 2017 through March 29, 2018. (Docs. 23 at ¶ 51; 25 at ¶ 10.) Maulolo provided records for seven visits with healthcare providers during the Elimination Period. (Doc. 25 at ¶¶ 33-34, 48; *see* A.R. 200–204, 381–386, 426–437, 448–451, 709, and 828.) After her initial denial, Maulolo submitted additional medical records when she realized she was not limited to submitting only three providers' records (the number of available spaces on the form, apparently). (Docs. 23 at ¶ 53; *see e.g.* A.R. 614.) The records depict chronic back problems, including the surgical removal of a cyst and installation of a spinal stimulator, and severe pain. (Docs. 23 at ¶¶ 4, 19, 23, 31, 36; 25 at ¶¶ 19, 24-26, 36; *see e.g.* A.R. 200, 203, 210, 342-348, 381–385, 421-426, 428–432, 435, 436-437, 448, 450, 614, 634-637, 707, 709, 826.) The records also extensively document her discomfort with sitting and preference to stand amid pain and discomfort for periods as short as 10 minutes, casting doubt on Sun Life's finding on her ability to do sedentary work. (*Cf.* A.R. 384-85, 418, 426, 429, 432, 441 with 615, 659-662.) Maulolo's treating pain physician, Dr. Schabacker, further explicitly supported Maulolo's claimed disability, and the Social Security Administration separately determined her disabled and entitled to Social Security disability benefits. (Doc. 23 at ¶¶ 35-37; A.R. 677, 878-879.) These facts are undisputed. While some of these records and findings pertain to examinations conducted after the Elimination Period, Maulolo's condition appears to have been

substantially unchanged from the time she left her employment through the final rejection of her claim.

Sun Life, on the other hand, proffers the report of an independent reviewing physician to dispute Maulolo's claim of disability. (Docs. 23 at ¶¶ 19, 25; 25 at ¶¶ 19-21.) Dr. Rowe stated Maulolo was capable of sedentary work, specifically finding she could sit for six hours; lift, carry, pull and push 50 pounds occasionally; and could frequently bend, squat, climb, and kneel. (A.R. 615.)

Given the conflicting medical evidence, this case is similar to *Kearney v. Standard Insurance Co*. In that case the plaintiff (Kearney) was a trial lawyer seeking disability under an ERISA plan for intellectual impairment secondary to heart disease and surgery. *Kearney*, 175 F.3d at 1086. In support of his claimed disability, Kearney pointed to findings from a cardiologist, Dr. Weinreb, who found that his heart condition precluded him from "very heavy work and very severe emotional stress" or a "very tight time schedule." *Id.* at 1092. Kearney also relied on the report of a psychiatrist and neurologist, Dr. Bittle, who found "it is highly medically probable that Mr. Kearney's memory/concentration and cognitive deficits do interfere significantly with his ability to function in the highly complex arena as a trial attorney." *Id.* at 1093.

The defendant insurer (Standard) countered with the report of another neurologist, Dr. Heublein, whose findings from a mental status examination of

Kearney were normal, and with a report from a psychiatrist, Dr. Smith, who found no evidence of cognitive deficiencies. *Id.* at 1092-1093.

The district court entered summary judgment in favor of Standard, finding Kearney's "IQ of 130, his playing several sets of tennis every weekend, his car-racing up to 120 miles per hour about ten times a year, and medical opinion that he ought to be able to return to work, left no genuine issue of material fact about whether he was disabled." *Id.* at 1087.

The Ninth Circuit reversed, finding the record established a genuine issue of fact as to whether Kearney was disabled under the plan. *Id.* at 1094. The court pointed out a reasonable trier of fact could conclude based on the evidence from Drs. Smith and Heublein that Kearney's memory and intellect were unimpaired, and that his car racing and other activities supported the conclusion that he could handle the mental and physical demands of trial work." *Id.* at 1093. At the same time, based on the evidence from Drs. Bittle and Weinreb, a trier of fact could reasonably conclude that Kearney's memory, intellect and inability to cope with stress disabled him from trial work. *Id.* Thus, the conflicting medical evidence presented an issue of fact which precluded summary judgment.

The same is true here. From the evidence presented by Maulolo's treating providers, the trier of fact could reasonably conclude that she was unable to perform one or more of the material and substantial duties of her position during

the relevant time period. Alternatively, the trier of fact may rely on the opinions of the Sun Life's consulting physician and conclude that she did have the functional capacity to perform her duties with Billings Clinic. These conflicting medical opinions create a genuine issue of material fact. See *Gordon*, 747 Fed.App'x. at 595 ("Because the parties have produced conflicting medical opinions regarding [the plaintiff's] disability, those opinions create a genuine issue of material fact," precluding summary judgment.) Summary judgment on the question of disability under the policy is not appropriate.

The parties' remaining arguments are secondary to the establishment of disability. One argument, however, warrants the Court's attention. Sun Life argues that Maulolo's claim under 29 U.S.C. § 1132(a)(3) fails as a matter of law because that section is designed solely for equitable relief and Maulolo only seeks enforcement of rights under § 1132(a)(1)(B). (Doc. 21 at 27.) Maulolo does not address this argument in her opposition brief. (*See generally* Doc. 18; Doc. 24 at 26-27.)

The Court agrees that Maulolo is seeking to recover benefits under the terms of her plan under § 1132(a)(1)(B) and not equitable relief under subsection (a)(3). Maulolo seeks "an award of disability benefits for which Paula paid" and omits any claim for equitable relief. (Doc. 24 at 27.) Maulolo does not clarify in briefing any act she wishes to enjoin which violates ERISA; or any equitable relief

she wishes to obtain to redress said violations or to enforce provisions of ERISA, for which § 1132(a)(3) would apply.

Therefore, the Court finds summary judgment should be granted as to Maulolo's claim under § 1132(a)(3).

## IV.    Conclusion

In summary, the Court finds that genuine issues of material fact exist as to whether Maulolo has met her burden of proof establishing total disability for the Elimination Period as required under Billings Clinic's group plan. The Court also finds Maulolo has failed to raise genuine issues of material fact regarding her claim under 29 U.S.C. § 1132(a)(3), and that summary judgment is appropriate as to that claim.

Therefore, the Court **RECOMMENDS** that Plaintiff Paula L. Maulolo's Motion for Summary Judgement (Doc. 17) be DENIED and Defendant Sun Life Assurance Company of Canada's Cross-Motion for Summary Judgment (Doc. 20) be DENIED in part and GRANTED in part as to Maulolo's claim under 29 U.S.C. § 1132(a)(3).

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties. The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court, and

copies served on opposing counsel, within fourteen (14) days after entry hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 22nd day of September, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge